**Benny SAYLOR, Appellant–Petitioner,**

v.

**STATE of Indiana, Appellee–Respondent.**

**No. 48S00–9712–PD–647.**

Supreme Court of Indiana.

March 20, 2002.

---

536

Susan K. Carpenter, Public Defender of Indiana, Thomas C. Hinesley, Deputy Public Defender, Emily Mills Hawk, Deputy Public Defender, Indianapolis, IN, for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, IN, for Appellee.

## ON APPEAL FROM THE DENIAL OF POST–CONVICTION RELIEF

RUCKER, Justice.

### Summary

■■■ A jury convicted Benny Saylor of murder, felony murder, robbery, and confinement in the 1992 stabbing death of Judy VanDuyn. Over the jury's contrary recommendation, the trial court sentenced Saylor to death, and we affirmed the convictions and sentence on direct appeal. *Saylor v. State*, 686 N.E.2d 80 (Ind.1997). Thereafter, Saylor filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. He now appeals that denial raising several issues for our review some of which are waived because they were known and available at the time of Saylor's direct appeal.[1] We address the remaining issues, which we rephrase as follows: (1) did the State suppress exculpatory evidence thereby violat-

---

1. Saylor frames those issues as follows:

 (1) The State misled the jury and judge by presenting false evidence and argument, and by suppressing evidence favorable to Saylor. The State also gained an unfair advantage by selecting the judge who would hear Saylor's case and decide his fate. (2) Saylor was denied his rights to cross-examine State's witnesses and to present a defense. (3) Undisclosed juror-witness relationships compromised Saylor's right to a fair trial by an impartial jury.... (5) Saylor's death sentence is unreliable because sentencing errors were not cured and Saylor was denied his rights at resentencing.... (8) Saylor's death sentence contravenes evolving standards of decency and international law.

 Br. of Petitioner–Appellant at 2. Even in death penalty litigation, post-conviction procedures do not afford defendants the opportunity for a super appeal. *See Conner v. State*, 711 N.E.2d 1238, 1244 (Ind.1999). Rather, as we have consistently pointed out, post-conviction procedures provide defendants the opportunity to raise issues that were not known at the time of the original trial or were not available to defendants on direct appeal. *Lowery v. State*, 640 N.E.2d 1031, 1036 (Ind.1994); *Kimble v. State*, 451 N.E.2d 302, 303–04 (Ind.1983). Claims that are available but not presented on direct appeal are waived for post-conviction review unless the claimed error is fundamental. *Wrinkles v. State*, 749 N.E.2d 1179, 1187 n. 3 (Ind.2001); *Conner*, 711 N.E.2d at 1246. Saylor recasts a number of the foregoing claims under the general heading of ineffective assistance of counsel. With the exception of the alleged *Brady* violation, we address the issues in that context only. Otherwise they are waived because Saylor has not demonstrated that fundamental error occurred.

ing Saylor's right to due process in violation of *Brady v. Maryland;* (2) was Saylor denied the effective assistance of trial counsel; (3) was Saylor denied the effective assistance of appellate counsel; (4) is Indiana's death penalty statute unconstitutional in light of *Apprendi v. New Jersey;* and (5) did the post-conviction court display bias against Saylor thus rendering the court's judgment unreliable. We affirm the post-conviction court's denial of Saylor's petition for post-conviction relief.

## Factual and Procedural Background[2]

At approximately 10:00 p.m. on June 17, 1992, Judy VanDuyn drove her van to a twenty-four hour laundromat at 8th Street and the Bypass in Anderson, Indiana. About an hour after she left, a violent storm hit the Anderson area. The storm, which was accompanied by large amounts of rainfall, wind, and lightning, caused widespread power outages and property damage and even set off tornado warning sirens.

Just after midnight on June 18, Charles Teague, the owner of the laundromat, received a telephone call from an unidentified woman complaining that the machines had stopped. When Teague arrived at the laundromat just ten minutes later, there were no cars in the front parking lot, and no one was inside. However, Teague found clothes in some of the washing machines. After determining that there was a power outage, Teague decided to lock up and go home. Leaving the laundromat, Teague noticed a red car parked at the side of the building.

After VanDuyn had not returned home by 3:30 a.m., her husband, Paul VanDuyn, became worried and proceeded to search for her. He arrived at the laundromat at approximately 4:25 a.m. and found the

door locked. Looking inside, Paul recognized some of the children's clothes in one of the washing machines and plastic bags in which VanDuyn had carried the laundry. As he was leaving the laundromat, Paul noticed a red Chevrolet Cavalier parked along the side of the building in an odd manner. Suspicious, he wrote down a description of the car and the license plate number. He then returned home and reported his missing wife to police.

Around 1:00 a.m., David Conrad, who lives on a rural Madison County farm, was watching the storm when he saw a van turn into his driveway. After a short period of time, the lights on the van shut off. The storm began to subside shortly thereafter, and Conrad decided to drive around the farm to survey for possible damage. As he started his truck, Conrad noted the lights on the van came on and the van began backing out of the driveway. It eventually came to rest in a field at the end of the driveway. Approaching the van, Conrad saw two people inside, a woman in the driver's seat and a man in the passenger seat. When Conrad asked the woman if there was a problem or if she needed help, the woman indicated that she did not. Assuming the couple was parking and wanted privacy, Conrad went on his way.

Gary Gibson also went out to check for storm damage early that morning and came across the van in Conrad's field a little after 3:00 a.m. When Gibson looked inside, he discovered a female body covered in blood lying on the floor between the seats. The body was identified as Judy VanDuyn. A later autopsy revealed that she had been stabbed or cut approximately forty-five times, twenty-eight times to her left breast alone, which caused se-

---

**2.** "R." refers to the trial court record. "Supp. R." refers to the supplemental trial court record. "P–C R." refers to the post-conviction court record.

vere internal injury and ultimately her death.

Investigating police officers arrived at the crime scene around 4:45 a.m. Because the field was extremely muddy from the storm, investigators discovered a trail of shoeprints approximately a half of a mile long leading away from the van. Along this trail of shoeprints, investigators found VanDuyn's purse and a dollar bill with blood on it. The shoeprints were so clear that investigators could read the brand name of the shoes as Jordache. Investigators also found a matching shoeprint on a piece of paper inside the van.

At 8:00 a.m., Captain Mark Thompson and Detective Robert Blount of the Madison County Sheriff's Department arrived at the VanDuyn home. They informed Paul that his wife had been the victim of a homicide. Paul gave them the description and license plate number of the car he had seen parked at the side of the laundromat earlier that morning. Captain Thompson ran a check on the license plate number and discovered that the car's owner was Benny L. Saylor of Anderson.

At 9:40 a.m., Captain Thompson and other police officers arrived at Saylor's house. A red Chevrolet vehicle, with a license plate number matching the one given by Paul, was parked in the driveway. When Saylor came to the door, the officers observed dried blood on the right side of his temple and hairline, a fresh laceration to his left ring finger, and numerous abrasions on his arms. Further, Saylor matched the description that Conrad had just given police of the man he had seen in VanDuyn's van earlier that morning. After reading Saylor his *Miranda* rights, the officers questioned him about his whereabouts during the night. Saylor said after spending the evening drinking alcohol and doing drugs with his friend Fredrick "Butch" VanHorn, he took VanHorn home

around 12:30 a.m. and then went straight home himself. Saylor later said that he went to the laundromat to obtain change to buy a drink before taking VanHorn home. When the officers questioned Saylor about his injuries, Saylor responded that the injury on his temple was from a fight with VanHorn. When asked about the other injuries, Saylor requested an attorney, at which point the officers ceased all questioning.

The officers immediately arrested Saylor and took him to the Madison County Jail. At the jail, police searched Saylor and found twenty-two dollars in wet currency and a soaking wet billfold. Police then executed a search warrant at Saylor's house. They found a pair of wet Jordache tennis shoes, which the FBI later determined were consistent with the shoeprints found at the crime scene, and a pair of soaking wet jeans. Later that day, Conrad viewed a line-up at the jail and positively identified Saylor as the person he had seen in VanDuyn's van earlier that morning.

On June 23, 1992, the State charged Saylor with murder, felony murder, and robbery and also filed a notice of its intent to seek the death penalty. The State later added a charge of confinement. Pursuant to Indiana Criminal Rule 24, the trial court appointed attorneys Jeffrey Lockwood and Mitchell Chabraja to represent Saylor. While incarcerated before trial, Saylor told Richard Herche, another inmate at the jail, several details about the crime. Specifically, Saylor told Herche that he had seen VanDuyn in the laundromat and decided to rob her when she brought her clothes out to the van and that he used a knife to force her to get into the van and drive away.

The trial was held January 5–18, 1994. The jury convicted Saylor as charged but recommended against the death penalty. Rejecting the jury's recommendation, the

trial court sentenced Saylor to death. We affirmed the convictions and sentence on direct appeal. Thereafter, Saylor filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. This appeal followed.

### Standard of Review for Post–Conviction Proceedings

■■■ The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5); *Curry v. State,* 674 N.E.2d 160, 161 (Ind.1996). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Curry,* 674 N.E.2d at 161. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Id.* Further, the post-conviction court in this case entered findings of fact and conclusions of law in accordance with Indiana Post–Conviction Rule 1(6). "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Ben–Yisrayl v. State,* 729 N.E.2d 102, 106 (Ind.2000) (quotation omitted), *cert. denied,* —— U.S. ——, 122 S.Ct. 73, 151 L.Ed.2d 38 (2001).

### I.

### Non-disclosure of Exculpatory Evidence

Saylor makes a number of assertions claiming the State suppressed material exculpatory or impeaching evidence. Specifically, he claims the State (1) failed to provide the criminal records for witnesses Herche and VanHorn; (2) did not disclose information about Herche's numerous failures to pay child support; (3) failed to produce an FBI report showing that fibers were found in the well of VanHorn's knife; (4) did not produce a police report describing VanHorn's knife as the murder weapon; (5) failed to provide a police report detailing the efforts of VanDuyn's husband to ascertain the amount of money Van-Duyn possessed on the night of the murder; (6) failed to provide photographs of the interior of the VanDuyn van in which a toy gun was shown; and (7) failed to produce a police report detailing an interview with the father of one of the State's trial witnesses.

■■■ *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. Evidence is "material" only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (quotation omitted). Therefore, to establish a *Brady* violation, Saylor must show that the State suppressed material evidence that was favorable to his defense. *Denney v. State,* 695 N.E.2d 90, 94 (Ind.1998).

■■■ As for Saylor's claims that the State failed to provide the criminal records of two witnesses, failed to disclose information concerning Herche's dereliction of his child support duties, and failed to produce a police report concerning an interview with the father of one of the State's witnesses, the record shows Saylor filed his

original petition for post conviction relief on July 1, 1998. P–C R. at 73–89. The petition was twice amended: once on October 30, 1998, and again on January 19, 1999. P–C R. at 99–136; 395–436. In none of the petitions does Saylor mention anything of the above three assertions he now claims in this appeal. Accordingly, the post-conviction court's eighty-six page "Findings of Fact, Conclusions Of Law And Judgment On Petition For Post–Conviction Relief" fail to mention anything concerning the claims Saylor now advances. P–C R. at 944–1030. In essence, Saylor is asking this Court to review a matter upon which he carried the burden of proof before the post-conviction court judge, but to whom Saylor never presented the claim in the first instance. These alleged errors are waived. *See* P–C R. 1(8); *Canaan v. State*, 683 N.E.2d 227, 235 (Ind.1997) (declining to address appellant's claim that the jury was improperly instructed on the burden of proof at both the guilt and habitual offender phases of his trial because defendant failed to set forth such a claim to the trial court, on direct appeal, or to the post-conviction court).

Concerning the allegation that the State failed to provide a photograph of the interior of the VanDuyn van in which a toy gun was shown, the post-conviction court found, and the record reflects, that not only were counsel provided the photograph, but also the photograph was introduced into evidence at trial as State's Exhibit 26. R. at 3589; P–C R. at 2466. The record also shows the toy belonged to the VanDuyn children. P–C R. at 2831. This evidence was not suppressed, and thus Saylor's claim of a *Brady* violation on this point fails.

With regard to the remainder of the alleged suppressed evidence, the post-conviction court determined it was not material. The record shows, and the post-conviction court found, that counsel were aware of the existence of the knife about which Saylor now complains. P–C R. at 2252–53. Although Saylor insists that the existence of the FBI report would have allowed him to impeach the testimony of various witnesses, he has not demonstrated that the outcome of the trial would have been any different.[3]

The same is true for the allegation that the State failed to provide a police report detailing the efforts of VanDuyn's husband to ascertain the amount of money VanDuyn possessed on the night of the murder. This report may have provided Saylor an opportunity to impeach the husband on a collateral matter. However, Saylor has not shown that the outcome of the trial would have changed. There was no *Brady* violation here.

### Standard of Review for Ineffective Assistance of Counsel

To establish a post-conviction claim alleging a violation of the Sixth Amendment right to effective assistance of counsel, a defendant must establish before the post-conviction court the two components set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). First, a defendant must show that defense counsel's performance was deficient. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. This requires showing that counsel's representation fell below an objective standard of reasonableness and that counsel made errors so seri-

---

**3.** The record also shows attorney Lockwood testified at the post-conviction hearing that he did in fact receive the FBI report on Van-Horn's knife either just before the trial began or before the FBI agent testified. P–C R. at 2252–53. In any event, it is apparent Saylor possessed the report, and thus his claim that the report was "suppressed" is not well taken.

ous that counsel was not functioning as "counsel" guaranteed to the defendant by the Sixth Amendment. *Id.* at 687–88, 104 S.Ct. 2052. Second, a defendant must show that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. 2052. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different. *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Further, counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption. *Ben–Yisrayl,* 729 N.E.2d at 106. Counsel's poor trial strategy, bad tactics, a mistake, carelessness, or inexperience does not necessarily amount to ineffective assistance of counsel. *Carr v. State,* 728 N.E.2d 125, 131 (Ind.2000).

## II.

### Ineffective Assistance of Counsel—Pre–Trial

 Saylor contends his counsel failed properly to investigate the State's case. He essentially claims that counsel should have hired an independent investigator to evaluate the State's evidence against him. Saylor presented to the post-conviction court testimony concerning the various actions an investigator would have taken if hired. The post-conviction court was not persuaded finding there was no ineffective assistance of counsel on this point because counsels' investigation strategy was not objectively unreasonable. P–C R. at 908. We agree with the post-conviction court. The record shows counsel worked diligently to investigate this case. Counsel in-

spected the van shortly after appointment, P–C R. at 2239; sought discovery and obtained copies of the State's evidence, P–C R. at 2238–39; deposed all of the State's witnesses, P–C R. at 1470; consulted with forensic experts, P–C R. at 1470–71, 2223; and retained various experts including a jury consultant, mitigation specialist, and two mental health experts, P–C R. at 1471–72, 2223–24. In addition, pursuant to the trial court's mutual reciprocal discovery order, the State supplied, and Saylor's counsel examined, numerous written statements, audiotapes, videotapes, witnesses' criminal records, an autopsy report, a coroner's report, a toxicology report, various FBI reports, and a police report. R. at 71–73, 122, 123, 132, 136; P–C R. at 1498, 1499–1954, 1956, 1957–2071. Saylor's counsel also moved for production of physical evidence, photographs, and jail records.

Saylor has not demonstrated that by failing to hire an independent investigator, counsels' performance was objectively unreasonable. *See Rondon v. State,* 711 N.E.2d 506, 518 (Ind.1999) (finding that defendant's claim of ineffective assistance based on counsel's alleged failure to further investigate the weight of the State's case is without merit; decision not to investigate is precisely the type of decision that falls within the broad definition of trial strategy). The deficiency argued by Saylor in this appeal does not approach the showing necessary to overcome the strong presumption of counsels' competence. In sum, Saylor has not demonstrated that the post-conviction court's findings are clearly erroneous.

## III.

### Ineffective Assistance of Counsel— Guilt Phase

Saylor sets forth a number of assertions that he contends demonstrate that counsel

rendered ineffective assistance during the guilt phase of trial. Consolidated, re-phrased, and reordered, those claims are as follows: (a) counsel failed to ensure an unbiased jury; (b) counsel failed to make timely and appropriate objections; (c) counsel failed adequately to prepare and present evidence supporting the defense theory of the case; (d) counsel failed to invoke Indiana Evidence Rule 404(b); and (e) counsel failed to tender certain jury instructions. We address each contention in turn.

### A. Jury Selection

■ Saylor claims that counsel were ineffective for failing to ensure an impartial jury. His claim is based on the following facts. At no time during voir dire did counsel question potential jurors on whether they were acquainted with any of the potential witnesses in the case. Later, as witnesses were called to testify, different jurors notified the court bailiff that they were acquainted with one or more witnesses. The bailiff in turn either wrote a note to that effect or instructed the juror to write such a note, which was then given to the trial judge.[4] Apparently no action was taken in response. Saylor seems to contend that counsels' failure to question the jurors at voir dire or provide them with a witness list amounted to ineffective assistance of counsel as a matter of law.[5]

At the post-conviction hearing, Saylor presented three of the nine jurors who had alerted the bailiff of his or her acquaintance with a particular witness. Each testified that the acquaintance did not cause

them to believe, disbelieve, or give more or less weight to that person's testimony than to testimony of any other witnesses. P–C R. at 2412, 2417, 2422. In this appeal, Saylor does not contend that the testimony of other jurors who also alerted the bailiff would have been any different if called to testify at the hearing. Although there may have been no strategic reason for counsel to refrain from questioning jurors on whether they knew any witnesses in the case, Saylor has not shown that such failure produced a biased jury. In sum, Saylor's claim fails the prejudice prong of *Strickland.*

### B. Failure to Object

■ Saylor contends counsel acted deficiently by failing to make various objections. The specific instances of alleged counsel error can be summarized as follows: (1) counsel failed to object when the State elicited victim impact testimony from VanDuyn's husband; (2) counsel failed to object to testimony concerning laboratory tests conducted on a knife found in Saylor's bedroom; and (3) counsel failed to object to various statements the prosecutor made during closing argument. In order to prevail on a claim of ineffective assistance of counsel due to a failure to object, a defendant must prove that an objection would have been sustained if made and that he was prejudiced by the failure. *Wrinkles,* 749 N.E.2d at 1192; *Timberlake v. State,* 690 N.E.2d 243, 259 (Ind.1997).

#### 1. Victim impact statement

■ Saylor claims that during the guilt phase of trial, Paul read a victim impact

---

4. Generally, the notes were in the form of "[juror] knows [witness]." P–C R. at 2433–41.

5. Specifically, Saylor contends counsel participated in "cultivating" what he refers to as "structural error." Br. of Petitioner–Appellant at 57. According to Saylor, "Structural

error is a 'defect affecting the [framework] within which the trial proceeds, rather than simply an error in the trial process itself.' " *Id.* at 48 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

statement to the jury to which counsel did not object. The post-conviction court rejected this claim finding that "[t]he evidence at issue was not victim impact evidence and was properly introduced." P–C R. at 906. Saylor does not challenge the post-conviction court's findings. Rather, he simply makes the above assertion in a three-line paragraph entitled "Guilt Phase Impact Evidence." Br. of Petitioner–Appellant at 58. Saylor has made no claim that the post-conviction court's findings are clearly erroneous. And our own review of the record does not leave us with a definite and firm conviction that a mistake has been made. *See Prowell v. State*, 741 N.E.2d 704, 708 (Ind.2001).

### 2. *Tests conducted on petitioner's knife*

■ In his petition for post-conviction relief, Saylor alleged "[c]ounsel failed to effectively challenge the improper and prejudicial identification of an irrelevant knife turned in to the police by Mr. Saylor's mother several months after the crimes[.]" P–C R. at 408. The post-conviction court found there was no ineffective assistance of counsel on this point because "[c]ounsel successfully argued that the knife was not connected to the crimes." P–C R. at 910.

The record shows that at trial, outside the presence of the jury, counsel, the prosecutor, and the court extensively discussed counsels' objection to introducing testimony concerning various knives, including the knife found in Saylor's bedroom. R. at 3610–24. The trial court overruled counsels' objection to such testimony. As such,

even if made, the trial court would not have sustained objections by counsel when specific witnesses testified concerning the knife.

### 3. *Comments made by the prosecutor during closing argument*

■ Saylor also contends his counsel performed deficiently for failing to object to several "misstatements" of the evidence made by the State in its closing argument. Br. of Petitioner–Appellant at 59. Specifically, he argues that the State's reiteration of three points testified to by three different witnesses was incorrect and required correction by counsel.

Our review of the record confirms the State's recollection of the evidence was not wholly consistent with the evidence actually introduced at trial.[6] However, counsel reasonably could have decided that objecting to the State's comments, interspersed at different places in the argument, would draw undue attention to them. This choice was a reasonable strategic decision. *See Conner*, 711 N.E.2d at 1250 ("By choosing not to object to ... the State's closing argument, defense counsel avoided drawing attention to testimony or argument unfavorable to the defendant. This was a legitimate strategy."). Saylor has failed to show that counsels' conduct fell below an objective standard of reasonableness.[7]

### C. *Failure To Invoke Indiana Evidence Rule 404(b)*

■ Saylor contends that counsels' performance was deficient also for allow-

---

**6.** For example, the State argued that Van-Horn's sister saw VanHorn get out of "Saylor's red car." R. at 4955–56. However, VanHorn's sister's testimony was that she saw VanHorn get out of "a red car." R. at 4137. Also, the State argued that a witness testified that "there is no way you can compare" animal hairs. R. at 5057–58. However, the wit-

ness testified that comparing animal hairs is "not a common practice...." R. at 4354.

**7.** Further, the trial court instructed the jury, among other things, that arguments of counsel "are not evidence but are given to assist you in evaluating the evidence." R. at 312.

ing into evidence Saylor's previous arrests that did not result in convictions. More particularly, he asserts counsel should have invoked Indiana Evidence Rule 404(b) to secure notice of any evidence of prior bad acts or crimes which the State intended to introduce against Saylor at trial. The facts are these. Saylor testified at trial, and on direct examination counsel asked if he had a "criminal record." R. at 4598. Saylor said "yes," and counsel extensively examined him on his past criminal convictions. R. at 4599–4602. Upon cross-examination, the prosecutor questioned Saylor about his previous arrests for burglary. R. at 4620. Counsel objected, but the court ruled that counsel had opened the door to Saylor's "complete criminal record" including arrests. R. at 4623. The post-conviction court found counsel were not ineffective for failing to make a Rule 404(b) request. P–C R. at 910. We agree.

Indiana Evidence Rule 404(b) requires the prosecution in a criminal case to provide reasonable notice in advance of trial if it intends to introduce evidence of other crimes, wrongs, or acts to prove motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Here, the State did not use Saylor's previous arrests to show any of these. Rather, the State used the previous arrests to impeach Saylor's direct examination testimony concerning his criminal record.

### D. Presentation of Evidence

■ Saylor contends counsel rendered ineffective assistance because they failed to prepare and present evidence to support the defense theory of the case. He asserts, for example, that counsel should have introduced: (1) a videotape of Van-Horn's statement to police; (2) testimony from Officer Blount alleging he coerced VanHorn into giving a statement; (3) evidence that VanDuyn's checkbook journal was inconsistent with the amount of money Paul estimated VanDuyn possessed on the night of the murder; and (4) evidence that Herche was lying about his conversation with Saylor. He also complains counsel should have done more to highlight certain testimony of VanHorn.

■ Counsels' theory at trial was that someone other than Saylor committed the crime. R. at 4146–47. At the post-conviction hearing, counsel elaborated stating that they tried to prove that more than one person was involved in VanDuyn's abduction and murder; that VanHorn was one of the persons involved; and that the evidence tying Saylor to the murder was weak or non-existent. P–C R. at 1484–86, 2223–32. Counsel additionally testified that by extensively cross-examining VanHorn about the inconsistencies in his statements, highlighting the fact that VanDuyn did not try to escape when a passerby approached the van, and by focusing on Saylor's intoxication and history of blackouts, they sought to prove that it was less likely that Saylor committed all the acts the State had alleged. P–C R. at 2234–36. The post-conviction court found that counsel were not ineffective in their investigation and presentation of the evidence:

> [T]rial defense was centered on placing Butch Van Horn at the scene of the crime and committing the murder. Counsel aggressively questioned Butch Van Horn and the three family members who testified on his behalf at trial seeking to undermine his alibi defense. Counsel also presented evidence that Butch Van Horn had made inculpatory statements to the police.

P–C R. at 905. Saylor has made no showing that the post-conviction court's finding

is clearly erroneous.[8]

### E. Jury Instructions

 Saylor claims counsel rendered ineffective assistance concerning two jury instructions.[9] The first instruction concerns the defense of intoxication. The facts are these. At trial, Saylor's counsel tendered a proposed instruction on voluntary intoxication as a defense to murder. The trial court declined to give it for two reasons: (1) counsel failed to comply with a previous order of discovery directing the defense to notify the State of all defenses; and (2) because counsel did not pursue a defense based on Saylor's inability to form intent, counsel were not entitled to an instruction on voluntary intoxication. R. at 4934–35 (citing *Ellis v. State,* 508 N.E.2d 790, 792 (Ind.1987) (no error in failing to instruct on voluntary intoxication as a defense to murder where defendant did not pursue a defense of inability to form intent)).[10] In this appeal, Saylor conveniently glosses over the second ground for the trial court's refusal to give the voluntary intoxication instruction.[11] Rather, without citation to authority and with no elaboration, Saylor contends "[d]efense counsel's failure to comply with discovery was deficient performance which preju-

diced Saylor by foreclosing a defense supported by the evidence." Br. of Petitioner–Appellant at 60. The post-conviction court found otherwise, and Saylor has neither argued nor shown that the court's findings are clearly erroneous.

 Saylor also contends counsel rendered ineffective assistance for failing to object to a jury instruction this Court disapproved in *Spradlin v. State,* 569 N.E.2d 948 (Ind.1991). The instruction read:

> In clothing those charged with crime with the presumption of innocence, the law does not contemplate that thereby the guilty should be shielded from merited punishment. Its object is to protect the innocent, so far as human agencies can, from the effects of unjust verdicts. The effect of this presumption is to withhold punishment from one charged with crime until all the facts necessary to constitute the offense charged have been proved to that degree of certainty fixed by law as being beyond a reasonable doubt.

> If a defendant is innocent, he should not be convicted erroneously, but if a defendant is guilty, he should not be acquitted erroneously.

---

8. We also observe that other than setting forth a laundry list of alleged failings, Saylor has not explained how counsel rendered ineffective assistance for not doing what he now says they should have done. He cites no facts, reasons to support his contention, citations to the record, or case law and makes no separate argument beyond a short paragraph. Although we have addressed the merits of Saylor's claim, it is waived for failure to present cogent argument. Ind. Appellate Rule 46(A)(8) (formerly App.R. 8.3(A)(7)); *Harrison v. State,* 707 N.E.2d 767, 777 (Ind.1999).

9. Saylor also argues counsel were ineffective for failing to tender an accomplice instruction in that the failure was both unreasonable in light of the defense theory and it prejudiced Saylor by precluding a defense of lesser cul-

pability. This claim is not available for review because it was not included in Saylor's petition for post-conviction relief. *See Minnick,* 698 N.E.2d at 753.

10. Counsel testified at the post-conviction hearing that they "were not postulating that [Saylor] was so drunk that he could not form an intent, we thought [intoxication] made it less likely that he did all the things and committed all the acts that the State were [sic] to him...." P–C R. at 2236.

11. He asserts: "The Court refused to give this instruction, *based in part* on the defense's failure to comply with its discovery order." Br. of Petitioner–Appellant at 60 (emphasis added) (citation omitted).

R. at 5068. We first observe that although we recommended that trial judges refrain from using this instruction, we did not reverse Spradlin's conviction on this ground. *Spradlin,* 569 N.E.2d at 951; *see also Matney v. State,* 681 N.E.2d 1152, 1154 (Ind.Ct.App.1997) ("The *Spradlin* court did not, however, hold that the giving of the [presumption of innocence] instruction constituted reversible error."), *trans. denied.* Thus, even assuming that counsel rendered deficient performance in failing to object to the instruction, Saylor has not shown that the objection would have been sustained if made.

## IV.

### Ineffective Assistance of Counsel—Penalty Phase

Saylor argues that his counsel were ineffective at the penalty phase of trial because counsel: (a) did not hire a mitigation expert until one year after they were appointed to his case; (b) failed to present all available mitigation evidence; and (c) did not present additional evidence at the time of sentencing. We address each contention in turn.

#### A. *Mitigation Specialist*

 The record shows that counsel did not hire a mitigation expert until nearly a year after entering their appearance in this case. However, other than stating that fact, Saylor advances no argument explaining how he was harmed. Attorney Chabraja testified at the post-conviction hearing that he began preparing for the penalty phase of trial while he was preparing for the guilt phase and that counsel

began marshalling mitigation evidence even before the expert was hired. P–C R. at 1478–79, 2080. The post-conviction court found that "counsel was not ineffective in failing to properly secure and use a mitigation specialist." P–C R. at 916. In this appeal, Saylor has neither argued nor demonstrated that the court's finding is clearly erroneous.

#### B. *Additional Evidence of Mitigation*

Saylor complains that counsel rendered ineffective assistance for failing to present all available mitigation evidence to the jury. He concedes that counsels' strategy apparently was successful—the jury recommended against the death penalty. He contends, however, that counsels' approach "failed Saylor at judge sentencing." Br. of Petitioner–Appellant at 62.

 Saylor's claim revolves around a disagreement between counsel and their mitigation expert. The expert wanted to present every piece of mitigation evidence, but counsel insisted on focusing primarily on the sexual abuse Saylor suffered as a child. Attorney Chabraja testified at the post-conviction hearing that sexual abuse was the most powerful mitigation factor in Saylor's case and in his view, everything else was secondary. P–C R. at 2108.[12]

 This Court realizes the importance of presenting mitigating evidence, particularly in capital cases. We have held that the failure to present mitigating evidence constitutes ineffective assistance of counsel, warranting the vacation of a death sentence. *See Harrison v. State,* 707

---

12. At judge sentencing, counsel presented seventeen witnesses, including expert testimony from Dr. Eric Engum. R. at 5292–5538. Although sexual abuse was the primary focus of much of the testimony, the jury also heard testimony about Saylor's alcohol and drug abuse beginning early in childhood, R. at 5384, 5459; Saylor's parents' drug and alcohol abuse during his childhood, R. at 5400–01, 5413–16, 5424–25, 5444–47, 5491; the severe punishment Saylor's parents inflicted on Saylor, R. at 5406, 5453, 5490–91; and Saylor's work habits, R. at 5317–18, 5323, 5342, 5363.

N.E.2d 767, 783 (Ind.1999) (citing *Burris v. State*, 558 N.E.2d 1067 (Ind.1990)); *Smith v. State*, 547 N.E.2d 817, 822 (Ind. 1989). However, our opinions were predicated in large part upon counsel's failure to investigate mitigating evidence. *See Burris*, 558 N.E.2d at 1074–76; *Smith*, 547 N.E.2d at 822. For example, we noted in *Burris* that "an attorney who makes a reasonable decision not to present evidence that his client had an exceptionally unhappy and unstable childhood after some investigation of the client's background, complies with the dictates of *Strickland*." 558 N.E.2d at 1075. Thus, counsel is permitted to make strategic judgments not to present certain types of mitigating evidence, including evidence of a defendant's background. *Canaan*, 683 N.E.2d at 234; *see also Timberlake*, 690 N.E.2d at 261 ("As a matter of trial strategy, a defense counsel in a capital case may decide what is the best argument to present during the penalty phase.").

Here, counsel adequately investigated mitigating circumstances and then made a strategic decision to focus the evidence on Saylor's sexual abuse. We will not second-guess their decision. Counsel reasonably believed that presenting evidence of Saylor's sexual abuse was enough to avoid a possible jury recommendation of a death sentence and that additional evidence would have served no material purpose.

### C. Additional Evidence at Sentencing

■ Saylor contends that counsel were ineffective for not finding and presenting additional mitigation evidence at the time of judge sentencing. He specifically argues that evidence implicating VanHorn in the murder should have been introduced to refute the intentional killing while committing a robbery aggravator, *see* Ind.Code § 35–50–2–9(b)(1)(G), and that more mitigation evidence on Saylor's home life and expert testimony about its effect on Saylor should have been presented. In support, Saylor cites ABA guidelines dictating, "Counsel should present to the sentencing entity or entities all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence." Br. of Petitioner–Appellant at 62 (quotation omitted).

At the post-conviction hearing, Saylor introduced several witnesses who presented testimony either impeaching VanHorn's alibi or implicating VanHorn in VanDuyn's murder.[13] Saylor claims that evidence relating to VanHorn was relevant to Saylor's culpability—whether he intentionally killed

---

13. For example, witness Tammy Stonebarger testified at the post-conviction hearing that she had a conversation with VanHorn in the afternoon of June 18, 1992, and VanHorn told her "he was there in the van." P–C R. at 3691. Candice Beatrice, a cousin of VanHorn, testified that she saw both VanHorn and Saylor June 18, 1992, and the subject of the murder came up. According to Beatrice, she asked if VanHorn had anything to do with the murder, to which he responded "he didn't remember anything. All he remembered was being in the van." P–C R. at 4659. "All he would say was he remembered being in the van and after that he was blacked out on and he didn't remember anything." P–C R. at 4662.

Further, at trial VanHorn's mother and sister provided VanHorn an alibi for his whereabouts on the night of the murder. At the post-conviction hearing, Saylor argued their testimony was not credible and presented testimony that both were frightened of VanHorn because of his tendency for violence. P–C R. at 2241–45, 3678, 4668–74. Saylor also presented hearsay testimony that VanHorn's sister allegedly said that on the night of the murder VanHorn "came home without a shirt, all wet, and stuck a knife in the wall." P–C R. at 3678. Allegedly she threw the knife in the trash because she was afraid he had killed someone. P–C R. at 3678, 3685.

VanDuyn—and should have been introduced.

■ Major participation in the killing coupled with a culpable mental state are needed to satisfy constitutional requirements in finding the intentional killing while committing a robbery aggravator. *Ajabu v. State,* 693 N.E.2d 921, 937 (Ind. 1998). This issue often surfaces when determining who, among two or more actors accused of committing a crime, acted as principals and accomplices. This is so because "[w]hile an accomplice may be found guilty of the crime largely executed by his principal, it does not follow that the same penalty is appropriate." *Id.* (quoting *Martinez Chavez v. State,* 534 N.E.2d 731, 735 (Ind.1989)). Here, the evidence Saylor presented to the post-conviction court goes to VanHorn's alleged participation in Van-Duyn's murder; it does not, as Saylor argues, address his own culpability. Additionally, while the evidence might implicate VanHorn as an additional participant, it does not disprove Saylor's major participation in the murder. Thus, Saylor has failed to show that had this evidence been introduced, the outcome would have been different.

■ At the post-conviction hearing, Saylor also introduced both lay and expert testimony concerning Saylor's home life and its effect. He argues that had this evidence been presented, the court "could not have reasonably found no mitigating circumstances to exist." Br. of Petitioner–Appellant at 63. Chiefly, Saylor's argument goes to the weight of the evidence presented; as in the penalty phase argument, he argues more mitigation evidence should have been presented. The post-conviction court found that the testimony offered at the post-conviction hearing was "only more of the same" and "largely undermined the theory of mitigation presented at the sentencing hearing."[14] P–C R. at 1001.

We have reviewed the additional evidence of Saylor's upbringing presented to the post-conviction court, and while it included information not presented at the time of judge sentencing, it adds only detail and not weight to the mitigating circumstances argued during the guilt phase of the trial. We find that counsel adequately presented the judge with at least the principal contours of Saylor's home life and its effect.[15] *See Bivins v. State,* 735

14. The post-conviction court further found:

> While his parents did admit to drug and alcohol use, they denied any knowledge that the children were being abused or that they themselves were abusing substances at young ages. Each of the parents stated that they would have tried to stop any such abuse had they known it was occurring. Moreover, the parents testified that they loved their children and sought to protect them, even from exposure to their own use of substances. Petitioner's mother and father were married for more than 30 years, and they remain married. Petitioner's father has worked for the same employer for 25 years, and often followed that job to distances far from home so that he could continue to provide for his family. When home, he made himself available to children who were not available to him, and he performed chores around the house. Petitioner's mother and father also set rules for their children, sought to enforce them, and attempted to discipline the children when the rules were breached. Petitioner's father testified that he tried his best but now knows that
>
> what he did was wrong; instead of disciplining Petitioner for, for example, stealing his father's gun and running away, he should have taken him fishing or told him he loved him.

P–C R. at 1001–02. Presentation of some of the additional mitigating evidence would have likely resulted in the judge being exposed to information that casts Saylor's claim in a negative light. *See Harrison,* 707 N.E.2d at 783–84.

15. We observe that the judge, in both the original and revised sentencing decisions, dis-

N.E.2d 1116, 1130–31 (Ind.2000) (finding that to the extent defense counsel's performance was deficient for failing to investigate and present additional circumstances, it only added detail and not weight to the mitigating evidence presented at trial), *reh'g denied; Ben–Yisrayl,* 729 N.E.2d at 112–13 (finding that the similarities in witnesses and subject matter between penalty phase and post-conviction evidence are such that defense counsel's performance did not fall below reasonable standards); *Roche v. State,* 690 N.E.2d 1115, 1126 (Ind. 1997).

 We also note that at sentencing, counsel focused on the high standard required for overriding a jury's recommendation against death. Counsel argued the standard had not been met, and thus the court could not override the jury's recommendation. R. at 5820–37. Clearly, this is not a case where counsel merely considered the sentencing proceedings a mere postscript to the trial. *See Averhart v. State,* 614 N.E.2d 924, 930 (Ind.1993) (finding ineffective representation where counsel threw his client on the mercy of the court and relied on the pre-sentence report to produce mitigating evidence). Counsel presented both additional evidence and argument to the court. Thus, counsels' performance does not lead us to a conclusion

contrary to the post-conviction court's determination that counsel provided competent assistance during sentencing.

## V.

## Ineffective Assistance of Appellate Counsel

 Saylor claims he was denied the effective assistance of counsel on direct appeal. The standard of review for a claim of ineffective assistance of appellate counsel is the same as for trial counsel; that is, the defendant must show that appellate counsel was deficient in his performance and that the deficiency resulted in prejudice. *Ben–Yisrayl,* 729 N.E.2d at 106. Ineffective assistance claims for this level of proceedings generally fall into three basic categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Bieghler v. State,* 690 N.E.2d 188, 193–95 (Ind.1998). With one exception, Saylor's claims are based on the second category.[16] That is, Saylor argues appellate counsel failed to raise a number of claims that should have been raised.

 A finding of deficient performance in the "waiver of issues" category only occurs when the reviewing court deter-

---

cussed as a mitigating factor whether Saylor was raised in a non-nurturing environment. R. at 5855–57; Supp. R. at 6. The judge found the mitigator was not applicable primarily based on the fact that Saylor's siblings, who were raised in the same environment, had not engaged in criminal conduct, and previous reports conflicted with the evidence presented. R. at 5855–57.

16. The exception is based on Saylor's contention that appellate counsel failed to present adequately trial court error in overriding the jury's recommendation. He acknowledges counsel raised this issue on direct appeal but contends they did a poor job because counsel neither cited nor distinguished a United

States Supreme Court case that was directly contrary to the position counsel advanced on appeal. *See Harris v. Alabama,* 513 U.S. 504, 511, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (rejecting defendant's suggestion that a trial judge must give "great weight" to the jury's advice). However, in this appeal from the post-conviction court's conclusion that appellate counsel did not render ineffective assistance on this point, Saylor provides no coherent analysis of *Harris.* Nor does Saylor explain or demonstrate how counsels' failure on direct appeal to cite *Harris* was an error so serious that counsel was not functioning as counsel guaranteed by the Sixth Amendment. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

mines that the omitted issues were significant, obvious, and "clearly stronger than those presented." *Bieghler*, 690 N.E.2d at 194 (quotation omitted). This is so because "the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." *Id.* at 193 (quotation omitted). As we noted in *Bieghler*, experienced appellate advocates emphasize " 'the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues.' " *Id.* at 193–94 (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)).

According to Saylor, appellate counsel rendered ineffective assistance on direct appeal for failing to raise the following claims: (1) use of victim impact evidence upon resentencing after remand; (2) use upon resentencing of Saylor's juvenile record; (3) allowing resentencing without Saylor being present; (4) failure to present evidence at resentencing; (5) restricting cross-examination of certain State witnesses; and (6) restricting Saylor's right to present a defense.[17] We address each contention in turn.

### A. Resentencing Claims

Before addressing these claims, we provide some background information. After the trial court imposed the death penalty over the jury's contrary recommendation, Saylor initiated his appeal. While the appeal was pending, this Court entered an order remanding the cause to the trial court with instructions to reconsider its sentencing order because it appeared the trial court had improperly relied upon victim impact evidence. *See Bivins v. State*, 642 N.E.2d 928, 956–57 (Ind.1994) (finding

in a death penalty case, victim impact evidence is only admissible if it is relevant to the death penalty statute's aggravating and mitigating circumstances). We allowed the parties to submit supplemental briefing after remand and resentencing. Thereafter, the trial court issued a new sentencing order once again imposing the death penalty.

### 1. Victim impact evidence

The original sentencing order included consideration of the impact VanDuyn's death had on her family. R. at 5848–49. That is the precise reason this Court ordered remand and resentencing. Saylor acknowledges the revised sentencing order did not include this consideration. He argues, however, that "[c]ourts cannot always 'unring the bell' once information like that has been heard. Subsequent appellate vindication, like remand, does not necessarily have its ordinary consequence of totally repairing the error." Br. of Petitioner–Appellant at 80. He claims appellate counsel should have raised this issue in the supplemental briefing.

We generally presume that in a proceeding tried by the bench, a court renders its decisions solely on the basis of relevant and probative evidence. *Coleman v. State*, 558 N.E.2d 1059, 1062 (Ind.1990) (rejecting defendant's claim that his constitutional rights were violated when a family member of a murder victim provided victim impact testimony at the judge sentencing). In this case, Saylor has not shown that the trial court did otherwise. Indeed, before the post-conviction court Saylor presented no evidence on this point.

---

**17.** Saylor also claims ineffective assistance of appellate counsel for failing to address comments the State made during closing argu-

ment. We addressed this claim *infra* at III. B.3 under the heading of ineffective assistance of counsel at the guilt phase.

### 2. *Saylor's juvenile record*

 Saylor contends that upon re-sentencing, the trial court erroneously relied on his juvenile record and that appellate counsel rendered ineffective assistance on direct appeal for failing to raise this issue.[18] Among other things, a death penalty mitigating factor includes "[t]he defendant has no significant history of prior criminal conduct." I.C. § 35–50–2–9(c)(1). In its sentencing order the trial court noted:

> The defendant, Benny Lee Saylor, has a history of criminal and delinquent behavior. It would take the Court many, many pages and paragraphs to delin[e]ate the prior criminal record of the defendant. The Court has examined the pre-sentence report and notes that the defendant has prior criminal activity and behavior dating to the age of ten years old. Mitigating circumstance number 1 [no significant history of prior criminal conduct] does not apply in this case.

Supp. R. at 2–3. Saylor seems to suggest that any use of his juvenile record for purposes of sentencing is prohibited. That is not the case. Rather, the court must rely on more than the existence of a delinquency petition. When a juvenile proceeding ends without a disposition, the mere fact that a petition was filed alleging delinquency does not suffice to prove criminal

history. *Day v. State*, 560 N.E.2d 641, 643 (Ind.1990). Indeed, an adjudication itself may not be enough to prove a criminal history. However, "the *acts* committed by the juvenile may constitute a criminal history to support enhancement of a sentence." *Id.* (emphasis added). In this case, the record does show that a few of Saylor's juvenile offenses were dismissed and at least one was disposed of informally. However, the record also shows that Saylor engaged in a number of acts as a juvenile that would have been crimes if committed by adults.[19] Saylor has not shown that the trial court relied improperly on his juvenile record in imposing sentence. In like fashion, Saylor has failed to demonstrate that appellate counsel rendered ineffective assistance in failing to pursue this issue on direct appeal.[20]

### 3. *Saylor's absence at resentencing and no evidence presented*

 Saylor complains that he was not present and thus was not allowed the opportunity to present evidence at the time the trial court entered its new sentencing order. According to Saylor, appellate counsel rendered ineffective assistance for not raising this issue on direct appeal. Saylor is correct that he was entitled to be present when the trial court entered the new sentencing order. I.C. § 35–38–1–15;

---

18. Saylor also claims that the trial court's "reliance on Saylor's past juvenile record violated Article One, Section Sixteen of the Indiana Constitution." Br. of Petitioner–Appellant at 80. Other than providing general citations to inapplicable case authority, Saylor provides no analysis for this constitutional claim. We therefore decline to address it.

19. They include burglary, three counts of theft, criminal mischief, and criminal trespass in November 1982 when Saylor was fifteen years of age; conversion in September 1983 at age sixteen; and conversion and burglary in May 1984 at age seventeen. R. at 350. The trial court's reference to a juvenile record

dating to the age of ten is apparently based on a charge of attempted auto theft in September 1977. However, the record shows the charge was disposed of "informally." R. at 350.

20. We note also that this claim would have failed on direct appeal for another reason. The point of the trial court's entry was that Saylor had a significant criminal history that negated a statutory mitigator. Without regard to his juvenile record, Saylor has a significant adult criminal record as well that includes several convictions for conversion, theft, and burglary. R. at 351–53.

*Flowers v. State,* 421 N.E.2d 632, 635 (Ind. 1981). However, it is not the case that he was entitled to present additional evidence. This Court has recently determined that when a case is remanded for a new sentencing order, the trial court can: (1) issue a new sentencing order without taking any further action; (2) order additional briefing on the sentencing issue and then issue a new order without holding a new sentencing hearing; or (3) order a new sentencing hearing at which additional factual submissions are either allowed or disallowed and then issue a new order based on the presentations of the parties. *O'Connell v. State,* 742 N.E.2d 943, 952–53 (Ind. 2001). Because Saylor would not have been entitled to present additional evidence even if he were present when the trial court entered the new sentencing order, he has not shown that the issue of his non-presence was significant or "clearly stronger than those presented."

### B. Error occurring at trial

#### 1. Limits on cross-examination

Saylor contends the trial court impermissibly restricted his efforts to cross-examine State's witnesses VanHorn, members of VanHorn's family, and fellow inmate Herche. He tells us nothing about how these claims arose or why he believes appellate counsel rendered ineffective assistance on direct appeal for not raising them. Rather, he says "relevant facts discussed in detail in Argument II are incorporated herein." Br. of Petitioner–Appellant at 81. Turning to that section of Saylor's brief is of little help. There, he makes no complaint concerning the cross-examination of Van-Horn or Herche. Rather, he complains about the cross-examination of Captain Thompson and two members of Van-Horn's family. *See* Br. of Petitioner–Appellant at 35–40. Even for these wit-

nesses, however, Saylor still does not explain how his cross-examination was impermissibly limited.

It would be appropriate under the circumstances to treat this issue as waived. However, we decline to do so and undertake an independent review of the record in an attempt to discern the error that Saylor now contends has occurred. *See Bieghler,* 690 N.E.2d at 195 (noting that we commonly review relevant portions of the record, perform separate legal research, and often decide cases based on legal argument and reasoning not advanced by either party). "[A] less than top notch performance does not necessarily prevent us from appreciating the full measure of an appellant's claim, or amount to a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 195–96 (citations, quotation, and footnote omitted). The record shows that in those instances involving VanHorn and members of his family, the trial court sustained the State's objection that Saylor's cross-examination question exceeded the scope of either direct or redirect examination. R. at 3607–09; 4141–48; 4149–52. With respect to Herche, the record shows that when Saylor posed a hypothetical question to the witness, the State objected on grounds that the facts were not based on evidence in the record. R. at 4468–69.

 The right of cross-examination is "one of the fundamental rights of the criminal justice system" and essential to a fair trial. *Reed v. State,* 748 N.E.2d 381, 391 (Ind.2001) (quotation omitted). However, there are limits in the exercise of that right. A cross-examination question that exceeds the scope of direct or redirect examination is improper and may be prohibited. Ind. Evidence Rule 611(b); *Fayson v. State,* 726 N.E.2d 292, 296 (Ind. 2000). In like fashion, a hypothetical ques-

tion, which is generally reserved for expert witnesses, is limited to facts in evidence. *Henson v. State*, 535 N.E.2d 1189, 1192 (Ind.1989).

▆▆▆ Finding that trial counsel aggressively cross-examined each witness and were not precluded from testing their testimony, the post-conviction court concluded that counsel "was not ineffective for not raising issues regarding any restrictions placed on his examination of Richard Herche, Butch Van Horn, Trixie Van Horn, Nina Clark, Mark Thompson and Hal Wood." P–C R. at 921. In this appeal, Saylor has not shown that the trial court erred in ruling on the State's objections or that the post-conviction court's finding was clearly erroneous.

### 2. *Right to present a defense*

Saylor states his next claim as follows: The trial court further restricted Saylor's right to present a defense. The defense was prevented from developing its theory that Saylor's severe substance abuse precluded any premeditation of this crime, and from corroborating Saylor's guilt phase testimony. Attempts to present the long-term sexual abuse suffered by Saylor and his siblings were restricted.

Br. of Petitioner–Appellant at 81. Saylor elaborates no further, cites no authority, and cites no portion of this voluminous record to support his assertion. As with the cross-examination claim, he merely directs us to another portion of his brief. Once there, we are provided little to no guidance.

We surmise Saylor is complaining about the following. The record shows Saylor took the stand in his own defense. At one point during direct examination counsel asked if Saylor had talked to a Dr. Eric Engum, to which he replied yes. Counsel then asked "is there a family history of blackouts or problems." R. at 4614. The prosecutor objected on relevancy grounds, and the trial court sustained the objection. *Id.* The record also shows that counsel called to the stand Dr. Eric Engum, a neuropsychologist. R. at 4736. After a series of questions and responses, the doctor testified that Saylor's history of substance abuse supported Saylor's own trial testimony that he suffered from blackouts and thus did not remember events occurring the night of the murder. R. at 4745–47. When asked if there was anything in Saylor's background which led to his chemical dependency, the doctor testified there was a history that Saylor suffered sexual abuse from a family member. R. at 4748. At that point, the prosecutor objected on relevancy grounds, the trial judge excused the jury, and a discussion ensued outside the jury's presence. R. at 4748–51. The trial court sustained the objection, and when the jury returned, the trial court admonished the jury to disregard the question. R. at 4752. Direct examination continued for several minutes with only one minor objection by the State, which was sustained. R. at 4752–63.

▆▆▆ We observe that Saylor's complaint that he was not allowed to pursue the issue of his substance abuse lacks merit. Two health professionals testified on this point.[21] As for his sexual abuse claim, Saylor has neither shown nor argued that the trial court erred in sustaining the

---

**21.** In addition to Dr. Engum, the record shows Saylor also called to the stand Dr. Kete Cockrell, a physician who limited his practice of medicine to addictions. R. at 4793. Among other things, Dr. Cockrell testified that it was possible that Saylor suffered a blackout in the early morning hours of June 18, 1992 "as a result of him suffering from the disease of chemical dependency." R. at 4796–97.

State's relevancy objection. Finally, in addressing appellate ineffective assistance of counsel, the post-conviction court noted, "While the appeal was ultimately unsuccessful, none of the issues now offered as incorrectly omitted are so clearly stronger than those raised as to warrant a different result. Indeed, Petitioner doe[s] not even allege as much, let alone offer the required comparative analysis to warrant relief." P–C R. at 921. We agree with the post-conviction court.

## VI.

### Denial of Meaningful Appellate Review

■ Saylor claims he was denied meaningful appellate review on direct appeal because this Court failed to review adequately the trial judge's override of the jury's recommendation against death. We ruled against Saylor on the jury override issue in his direct appeal. *See Saylor*, 686 N.E.2d at 87–88. We now revisit this issue in light of the recent United States Supreme Court decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

*Apprendi*, a non-capital case, involved a New Jersey "hate crime" statute that authorized a trial court to increase the sentencing range for a crime when the court found, by a preponderance of the evidence, that the defendant's purpose in committing the crime was to intimidate an individual or a group because of race, color, gender, handicap, religion, sexual orientation, or ethnicity. *Id.* at 468–69, 120 S.Ct. 2348. Finding this statute unconstitutional under the Fourteenth Amendment's Due Process Clause, the United States Supreme Court announced the general rule that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348.

■ Indiana's capital sentencing statute provides three distinct steps that a trial court must take in reaching its sentencing decision in cases where the jury has found a defendant guilty of murder and the State has sought the death penalty. First, the trial court must find that the State proved beyond a reasonable doubt the existence of at least one aggravating circumstance listed in the death penalty statute. I.C. § 35–50–2–9(k)(1). Second, the trial court must find that the aggravating circumstance or circumstances outweigh any mitigating circumstances. I.C. § 35–50–2–9(k)(2). Third, before making its final sentencing determination, the trial court must consider the jury's recommendation. I.C. § 35–50–2–9(e); *Roark v. State*, 644 N.E.2d 565, 570 (Ind. 1994). Saylor contends that in light of *Apprendi*, Indiana's death penalty statute is unconstitutional because it deprives him of the right to have a jury—rather than a court—determine the existence of an aggravating circumstance beyond a reasonable doubt.

■ In *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the United States Supreme Court addressed a sentencing scheme similar to Indiana's. In Arizona, after a jury finds a defendant guilty of first-degree murder, the trial court alone conducts a sentencing hearing to determine whether the sentence should be death or life imprisonment. *Id.* at 643, 110 S.Ct. 3047. During the course of the hearing, the court determines the existence of any statutory aggravating or mitigating circumstances. *Id.* The court can impose a sentence of death only if it finds that one aggravating circumstance exists and that there are no mitigating circumstances sufficiently substantial to merit leniency. *Id.* at 644, 110 S.Ct. 3047.

Finding this capital sentencing scheme constitutional, the United States Supreme Court explained that it is well settled that the existence of an aggravating circumstance that renders a defendant eligible for the death penalty may be determined by a judge rather than a jury. *Id.* at 647–48, 110 S.Ct. 3047. In *Apprendi*, the United States Supreme Court was careful not to overrule *Walton.* The Court explained:

> Finally, this Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death. *Walton v. Arizona,* [497 U.S. 639, 647–49, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).]

*Apprendi,* 530 U.S. at 496–97, 120 S.Ct. 2348.

Criticizing the majority opinion, four justices in dissent insisted that *Apprendi* effectively overruled *Walton, id.* at 538, 120 S.Ct. 2348; and one justice, in a separate concurring opinion, declared that *Walton* could be re-examined "another day," *id.* at 523, 120 S.Ct. 2348. In any event, although *Apprendi* may raise doubt about the continued validity of *Walton,* until it is expressly overruled, *Walton* is still good law.[22] *See Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (directing lower federal courts to "leav[e] to this Court the prerogative of overruling its own decisions.") (quotation omitted). We conclude that in light of *Walton,* Saylor's *Apprendi*-based challenge to Indiana's death penalty statute must fail.

▌ Apart from *Walton,* Saylor's challenge fails also for another reason. *Apprendi* dictates, "[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348. *Apprendi* does not require that a jury find beyond a reasonable doubt every fact related to sentencing. Rather, *Apprendi* requires that only those facts that increase the penalty for a crime beyond the prescribed maximum be proved beyond a reasonable doubt. As the Court explained:

> We should be clear that nothing ... suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in

---

**22.** This is the view expressed by those jurisdictions that have addressed the issue. *See, e.g., United States v. Promise,* 255 F.3d 150, 160 (4th Cir.2001) (holding that whether *Apprendi* overrules *Walton* is a matter "for the Supreme Court"), *petition for cert. filed,* —— U.S.L.W. —— (U.S. Sept. 20, 2001) (No. 01–6398); *Hoffman v. Arave,* 236 F.3d 523, 542 (9th Cir.2001) ("[W]hile *Apprendi* may raise some doubt about *Walton,* it is not our place to engage in anticipatory overruling."), *cert. denied,* —— U.S. ——, 122 S.Ct. 323, 151 L.Ed.2d 241 (2001); *Arizona v. Sansing,* 200 Ariz. 347, 26 P.3d 1118, 1131 (2001) (holding that the question of whether *Apprendi* overrules *Walton* "is not one that may be answered by this court."), *petition for cert. filed,* —— U.S.L.W. —— (U.S. Jan. 4, 2002) (No. 01–7837); *Arizona v. Ring,* 200 Ariz. 267, 25 P.3d 1139, 1150 (2001) (finding that *Apprendi* did not overrule *Walton* ), *cert. granted,* —— U.S. ——, 122 S.Ct. 865, 151 L.Ed.2d 738, 70 U.S.L.W. 3246 (2002) (No. 01–488); *Illinois v. Kaczmarek,* 318 Ill.App.3d 340, 251 Ill.Dec. 953, 741 N.E.2d 1131 (2000) ("Thus, while it appears *Apprendi* extends greater constitutional protections to noncapital, rather than capital, defendants, the Court has endorsed this precise principle, and we are in no position to second guess that decision here.").

imposing sentence within statutory limits in the individual case.

*Id.* at 481, 120 S.Ct. 2348 (emphasis omitted).

In *Apprendi*, the statutory maximum penalty for the crime of which the defendant was convicted was ten years. A totally separate statute, known as a "hate crime" law, provided for an "extended term" of imprisonment when the court found that the defendant's purpose in committing the crime was to intimidate an individual or a group because of race, color, gender, handicap, religion, sexual orientation, or ethnicity. *Id.* at 468–69, 120 S.Ct. 2348. Unlike the statute under which the defendant was convicted in *Apprendi,* Indiana's sentencing statute for murder provides that the maximum sentence is death:

(a) A person who commits murder shall be imprisoned for a fixed term of fifty-five (55) years, with not more than ten (10) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances; in addition, the person may be fined not more than ten thousand dollars ($10,000).

(b) *Notwithstanding subsection (a),* a person who was at least sixteen (16) years of age at the time the murder was committed may be sentenced to:

(1) death; or

(2) life imprisonment without parole....

I.C. § 35–50–2–3 (emphasis added). It is true that a person may be sentenced to death only upon proof beyond a reasonable doubt of the existence of certain statutory aggravating circumstances and upon a finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances. I.C. § 35–50–2–9(k)(1), (2); *Roark,* 644 N.E.2d at 570. However, when construing a statute, all sections of the act should be viewed together. *Fuller v. State,* 752 N.E.2d 235, 238 (Ind.Ct.App. 2001); *see also State v. Eilers,* 697 N.E.2d 969, 970 (Ind.Ct.App.1998) ("[S]tatutes relating to the same subject matter should be construed together in order to produce a harmonious statutory scheme."). The fact that death is a possible sentence where a murder is accompanied by one or more statutory aggravators places death as the prescribed statutory maximum. *See United States v. Smith,* 223 F.3d 554, 565 (7th Cir.2000) (rejecting defendant's *Apprendi*-based claim where a life sentence was "possible" under federal statute even though it was not a certainty), *petition for cert. filed,* —— U.S.L.W. —— (U.S. Jan. 16, 2001) (No. 00–8082); *see also Illinois v. Vida,* 323 Ill.App.3d 554, 256 Ill. Dec. 734, 752 N.E.2d 614, 628 (2001) (holding that when determining the "prescribed statutory maximum," the court must look at the "overall sentencing scheme"). On this additional ground we conclude that Saylor has failed to show that Indiana's death penalty statute is unconstitutional within the dictates of *Apprendi.*[23]

---

**23.** We note in passing that with the exception of four panels of the intermediate appellate court in Illinois, no state or federal court has extended *Apprendi* to its capital sentencing scheme. *See, e.g., Arizona v. Hoskins,* 199 Ariz. 127, 14 P.3d 997, 1016–17 n. 2 (2000) (noting *Apprendi* does not apply to capital sentencing schemes), *cert. denied,* —— U.S. ——, 122 S.Ct. 386, 151 L.Ed.2d 294 (2001); *Weeks v. Delaware,* 761 A.2d 804, 806 (Del.

2000) ("[W]e are not persuaded that *Apprendi's* reach extends to state capital sentencing schemes in which judges are required to find specific aggravating factors before imposing a sentence of death.") (quotations omitted), *cert. denied,* 531 U.S. 1004, 121 S.Ct. 476, 148 L.Ed.2d 478 (2000); *Mills v. Moore,* 786 So.2d 532, 537 (Fla.2001) ("[T]he plain language of *Apprendi* indicates that the case is not intended to apply to capital sentencing

## VII.

### Post–Conviction Court Bias

For his final allegation of error Saylor asserts the post-conviction court judge was biased against him thereby rendering the court's judgment unreliable. He points to two events in support of his assertion: (1) the judge's wholesale adoption of the State's proposed findings of fact and conclusions of law; and (2) ex parte communication between the post-conviction court judge and the prosecutor who handled Saylor's original trial.

■■■■ As to item (1), this Court recently addressed this issue and held that the practice of a judge adopting a party's proposed findings and conclusions in a post-conviction proceeding is not prohibited. *Prowell,* 741 N.E.2d at 709. As we discussed:

> It is not uncommon for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. The trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft

more elegant trial court findings and legal reasoning. We recognize that the need to keep the docket moving is properly a high priority for our trial bench. For this reason, we do not prohibit the practice of adopting a party's proposed findings.

*Id.* at 708–09. Thus, although we do not encourage post-conviction court judges to adopt wholesale the findings and conclusions of either party, we decline to find bias solely on that basis. The critical inquiry is whether the findings adopted by the court are clearly erroneous. *See Woods v. State,* 701 N.E.2d 1208, 1210 (Ind.1998) (accepting findings of fact unless they are clearly erroneous, although we give conclusions of law no deference). Here, out of eighty-six pages of findings and conclusions, based on a trial and post-conviction record exceeding forty-four volumes, Saylor points to four minor inconsistencies between the evidence presented at trial and the findings of the trial court. And in one instance of an alleged erroneous finding, Saylor is simply wrong.[24] In any event, Saylor has not demonstrated bias based on this point.

schemes."), *cert. denied,* 532 U.S. 1015, 121 S.Ct. 1752, 149 L.Ed.2d 673 (2001); *Missouri v. Black,* 50 S.W.3d 778, 792 (Mo.2001) (holding that *Apprendi* does not apply to capital sentencing schemes that permit judges to find certain aggravating circumstances), *cert. denied,* —— U.S. ——, 122 S.Ct. 1121, 151 L.Ed.2d 1014 (2002); *North Carolina v. Golphin,* 352 N.C. 364, 533 S.E.2d 168, 193 (2000) (holding that *Apprendi* does not apply to state capital sentencing schemes), *cert. denied,* 532 U.S. 931, 121 S.Ct. 1379, 1380, 149 L.Ed.2d 305 (2001).

24. Specifically, he challenges the following finding: "Dr. Clark was of the opinion that there was only one assailant, because the wounds were grouped in one area of the body; where there is more than one assailant, the wounds are generally distributed over a

much wider area of the body." P–C R. at 861. Saylor points to testimony Dr. Clark gave at the post-conviction hearing where he said "it is not possible to state with certainty that all of the stab wounds to the victim were inflicted by one person." P–C R. at 3283. However, at trial, responding to the question of whether he had an opinion as to whether there was one or more assailants, Dr. Clark testified that "[m]y opinion is there was one assailant." R. at 4550. When asked why, he testified, "Because the injuries are all grouped relatively in the same area of the body.... In those rare cases that I have seen where there has been more than one assailant, the injuries are generally distributed over a much wider area of the body than I see here." R. at 4550–51. The post-conviction court was not bound by contrary testimony provided at the hearing.

■ Concerning the ex parte communication, the facts are these. William Lawler was the former prosecutor for Madison County and had prosecuted Saylor at trial. Several days after the conclusion of the hearing on Saylor's petition for post-conviction relief, Lawler was present at the Madison County Courthouse and, as was his custom, visited the Circuit Court to say hello to court personnel including Judge Spencer, the Special Judge appointed to preside over the post-conviction hearing. P–C R. at 4754, 4757. While there, Lawler and Judge Spencer engaged in "small talk" lasting no more than three to five minutes that included a discussion about the Shrine Club and the price of Vidalia onions. P–C R. at 4761–63. In the course of that conversation the Saylor case was mentioned in general terms, with Judge Spencer making "one (1) or two (2) brief remarks about the difficulty in cases where you have to decide if a person lives or dies." P–C R. at 4780. Judge Spencer later disclosed the conversation to the appropriate authorities. P–C R. at 4781–82. After Saylor's counsel learned of the meeting, he filed a motion for recusal. After a hearing, the motion was denied.

■ The law presumes that a judge is unbiased and unprejudiced. *James v. State*, 716 N.E.2d 935, 940 (Ind.1999); *In re Edwards*, 694 N.E.2d 701, 711 (Ind. 1998); *Smith v. State*, 535 N.E.2d 1155, 1157 (Ind.1989). However, Indiana practice has always leaned toward recusal where reasonable questions about impartiality exist. *Tyson v. State*, 622 N.E.2d 457, 460 (Ind.1993). Indiana's Code of Judicial Conduct provides, "A judge shall not initiate, permit, or consider ex parte communications." except in limited circumstances. Ind. Judicial Conduct Canon 3(B)(8). It further provides, "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality

might reasonably be questioned...." Jud.Canon 3(E). The test then is whether an objective person, knowledgeable of all the circumstances, would have a reasonable basis for doubting the judge's impartiality. *James*, 716 N.E.2d at 940; *Edwards*, 694 N.E.2d at 710; *Tyson*, 622 N.E.2d at 459. Here, the test is not met. The facts and circumstances are significantly different from those in which there is a reasonable basis for doubting the judge's impartiality. *Cf. Tyson*, 622 N.E.2d at 459–60 (finding a reasonable basis where the judge's wife advised an attorney on how to obtain a better result for his client appearing before the judge); *Bell v. State*, 655 N.E.2d 129, 132 (Ind.Ct. App.1995) (finding a reasonable basis where the judge made no effort to explain the nature of his ex parte communication with defendant's co-conspirator or to assure defendant that the private meeting in no way impacted his case); *In re Guardianship of Garrard*, 624 N.E.2d 68, 70 (Ind.Ct.App.1993) (finding a reasonable basis where the court met ex parte with an expert witness in an attempt to settle the matter more quickly). We conclude that Saylor's claim of judicial bias fails.

### Conclusion

Applying our standard of review in an appeal from a negative judgment in a post-conviction proceeding, we find that the evidence does not unmistakably and unerringly lead to a conclusion contrary to the post conviction court's decision. We therefore affirm the post-conviction court's denial of Saylor's petition for post-conviction relief.

SHEPARD, C.J., and DICKSON, J., concur.

BOEHM, J., concurs except as to Part VI, on which he concurs in result with opinion.

SULLIVAN, J., concurs except as to Part VI, on which he dissents with opinion.

BOEHM, Justice, concurring and concurring in result as to Part VI.

One may describe Indiana's death penalty statute as creating a separate crime with additional elements or as simply describing aggravating circumstances in sentencing for a crime which carries the maximum penalty of death. This debate seems to me to be one of semantics, not substance. At bottom, one cannot be sentenced to death in Indiana unless the crime is committed under circumstances that include one of the listed "eligibility" factors. As a result, Justice Sullivan's reasoning as to the logic of *Apprendi* seems persuasive to me. At the least, Justice Sullivan's dissent, echoing Justice O'Connor's dissent in *Apprendi v. New Jersey*, 530 U.S. 466, 523, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), raises very substantial issues as to the application of that decision by the Supreme Court of the United States to Indiana's death penalty statute.

The effect of *Apprendi* on death penalty statutes similar to Indiana's is currently under consideration in the Supreme Court of the United States in *Arizona v. Ring*, 200 Ariz. 267, 25 P.3d 1139 (2001), *cert. granted,* —— U.S. ——, 122 S.Ct. 865, 151 L.Ed.2d 738 (Jan. 11, 2002). In *Ring*, on the authority of *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), the Supreme Court of Arizona upheld on direct appeal that state's death penalty despite the subsequent holding in *Apprendi*. *Walton* is, of course, the principal support for the majority's views on this issue. Despite the grant of certiorari in *Ring*, I find the majority's prediction as to the likely result in that case to be plausible. One thing is certain: until *Ring* is decided, this issue of federal constitutional law is unresolved. However, as explained below, whatever the resolution of this issue as a general proposition, I believe Saylor's sentence does not violate the Constitution of the United States.

This case raises a second debatable issue. Before *Apprendi* was decided, Saylor's trial and sentencing, his direct appeal, and his petition for certiorari were all concluded. Even if it is determined that *Apprendi* invalidates the future authority of Indiana trial judges to sentence defendants to death against the jury's recommendation, it is not at all clear that *Apprendi* applies retroactively to Saylor's case.

It is not clear to me, as both the majority and Justice Sullivan appear to assume, that *Apprendi* would retroactively apply to Saylor's case. Under the "new rule" doctrine announced in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), as applied to initial federal habeas corpus proceedings[1] and adopted in *Daniels v. State*, 561 N.E.2d 487 (Ind.1990), for Indiana postconviction relief, "a new con-

---

1. When a new rule applies retroactively in a federal habeas proceeding is the subject of some debate and may differ depending on whether it is the prisoner's first petition. *See United States v. Sanders*, 247 F.3d 139, 146 n. 4 (4th Cir.2001) ("[I]t is possible that lower courts can declare new rules retroactive on initial petitions."); *Ashley v. United States*, 266 F.3d 671, 673 (7th Cir.2001) (wording of habeas statute "implies that courts of appeals and district courts may 'make' the retroactivity decision" on initial petitions); *Browning v.* *United States*, 241 F.3d 1262, 1265 (10th Cir. 2001) ("[I]t is clear that the retroactivity determination for second or successive habeas applications belongs wholly to the Supreme Court."). Retroactivity in federal proceedings is an issue of federal law and has no application to this Court's review of postconviction relief petitions. *State v. Mohler*, 694 N.E.2d 1129, 1132 (Ind.1998) ("State courts hearing claims for collateral review ... are free to set their own retroactivity rules independent of *Teague*.").

stitutional rule of criminal procedure is generally not applicable to those cases on collateral review, that is, those which have become final before the new rule was announced." *Id.* at 488–89. Saylor's present appeal is from the denial of his petition for postconviction relief. As such, it is a collateral review proceeding akin to an initial petition for federal writ of habeas corpus. *Id.* at 488. Although Indiana is theoretically free to fail to give retroactive effect to a new federal constitutional rule governing procedure by denying its postconviction relief procedure to those who seek to invoke a new rule, I can see no reason why we should choose to do so. The only effect of such a refusal would be to force to federal habeas corpus proceedings a claim that we recognize to be valid. So as a practical matter, I would regard the status of *Apprendi* under *Teague* and *Daniels* to be also governed by the ultimate resolution of the retroactivity issue under federal law.

For a new constitutional rule of criminal procedure to apply retroactively on collateral review, that rule must either place certain kinds of conduct "beyond the power of the criminal law-making authority to proscribe" or require the observance of those procedures "implicit in the concept of ordered liberty." *Teague,* 489 U.S. at 307, 109 S.Ct. 1060. At least five Circuit Courts of Appeal have examined the issue of whether *Apprendi* applies retroactively on initial petitions for habeas corpus. All five have said no. *See United States v. Sanders,* 247 F.3d 139 (4th Cir.2001); *United States v. Moss,* 252 F.3d 993 (8th Cir.2001); *Jones v. Smith,* 231 F.3d 1227 (9th Cir.2000); *United States v. Aguirre,* 2002 WL 188972 (10th Cir. Feb. 7, 2002); *McCoy v. United States,* 266 F.3d 1245 (11th Cir.2001). Judges routinely make findings incident to criminal proceedings, and particularly incident to sentencing. Even if the eligibility factor is viewed as an element, its finding by a trial judge may be viewed as not inherently suspect such that the "fundamental fairness" of the proceeding is in doubt. *Teague,* 489 U.S. at 311, 109 S.Ct. 1060.

All of the foregoing seems to me to be trumped by the fact that Saylor was on probation at the time of the crime. That circumstance seems to me to put Saylor's case within the doctrine announced in *Apprendi* that the fact of a prior conviction is not among the facts that need to be found by the jury. *Apprendi,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). Status as a parolee or probationer seems to me to be qualitatively the same as a prior conviction for these purposes. Both are established by judicial records and require none of the fact-finding we expect of the jury. One of the eligibility factors the State alleged, and the trial court found, was Saylor's having committed the murder while on probation for a previous burglary. Accordingly, I believe Saylor's sentencing does not implicate *Apprendi* whether or not that holding applies retroactively. *Brannigan v. United States,* 249 F.3d 584, 587 (7th Cir.2001) ("[W]hen an argument invoking *Apprendi* would fail even if that case turns out to be fully retroactive, we deny it on the merits in order to forestall a further round of litigation if the Supreme Court later should decide in favor of retroactivity.").

For the foregoing reasons, I concur in result as to Part VI of the majority opinion. I concur in the remaining portions of the opinion.

SULLIVAN, Justice, concurring in part and dissenting in part.

I agree with the majority's analysis and conclusion that Saylor is not entitled to

post-conviction relief from his conviction for murder. I disagree, however, with its analysis and conclusion that the Indiana capital murder and sentencing scheme complies in all respects with the requirements of the Supreme Court's recent *Apprendi* decision.[1] I believe that in most cases, our death penalty statute does not violate *Apprendi*. But contrary to the majority's view, I believe that in certain cases in which the jury recommends either a term of years or makes no sentencing recommendation and the judge nevertheless sentences the defendant to death, the requirements of *Apprendi* are not met and the sentence is therefore unconstitutional. Saylor's is such a case.

In summary, my argument is this.[2] In death penalty cases, *Apprendi v. New Jersey* does not "permit[ ] a judge to determine the existence of a factor which makes a crime a capital offense;" rather, a jury must determine the existence "of all the elements of an offense which carries as its maximum penalty the sentence of death...."[3] When a judge in Indiana imposes a death sentence where the jury has recommended against death or has made

no sentencing recommendation, the judge in certain cases makes the determination *Apprendi* reserves for the jury.[4] That is what the judge did in Saylor's case.

## I

To explain why I believe Indiana's (unique) capital murder and sentencing scheme in part violates *Apprendi*, I begin with a review of our statute and, in particular, the two distinct functions of "aggravating circumstances" within it.

## A

The Supreme Court has divided capital cases into two stages: an "eligibility" stage in which the defendant is found to be a member of the narrowed death-eligible class; and a "selection" stage in which the death-eligible defendant's sentence is determined. *See generally Tuilaepa v. California*, 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994); *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Nina Rivkind & Steven F. Shatz, *Cases and*

---

1. Like the majority, I assume for purposes of this opinion that the holding in *Apprendi* is retroactive to Saylor's case. There are a growing number of federal cases addressing the issue of whether *Apprendi* is to be applied retroactively in federal habeas cases. *See United States v. Sanders*, 247 F.3d 139, 146 (4th Cir.) *cert denied*, — U.S. —, 122 S.Ct. 573, 151 L.Ed.2d 445 (2001) ("neither the Supreme Court nor any of our sister circuits have held that *Apprendi* is retroactively applicable on collateral attack.") Several district courts have held that *Apprendi* does apply to habeas corpus petitions. *See Levan v. United States*, 128 F.Supp.2d 270, 275–76 (E.D.Pa. 2001) (listing cases). However, the question of whether *Apprendi* applies retroactively for purposes of state collateral review is a question of state, not federal, law. *See generally State v. Mohler*, 694 N.E.2d 1129 (Ind.1998) (discussing *Daniels v. State*, 561 N.E.2d 487 (Ind.1990)).

2. This same analysis applies where a judge imposes a sentence of life without parole notwithstanding a jury recommendation of a term of years or no jury sentencing recommendation. In order to simplify this opinion, I will omit references to the life without parole scenario except where necessary or where the applicable Indiana precedents involve sentences of life without parole rather than death.

3. 530 U.S. 466, 497, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (internal quotation marks and citation omitted).

4. I have made a similar argument as a matter of statutory construction in dissent in another case. *Farber v. State*, 729 N.E.2d 139, 142 (Ind.2000) (Sullivan, J., dissenting).

*Materials on the Death Penalty* 135 (2001).

Our Legislature has established the crime of murder in Ind.Code § 35–42–1–1. As in all criminal prosecutions, a defendant accused of murder is entitled to a trial by jury in which the State is required to prove beyond a reasonable doubt each of the elements of the crime. U.S. Const. amends. VI & XIV; *Apprendi,* 530 U.S. at 476–77, 120 S.Ct. 2348 (quoting *United States v. Gaudin,* 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)).

However, a defendant convicted of murder under Ind.Code § 35–42–1–1 is not eligible for a sentence of death. As *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), suggested, and *Gregg,* and its companion cases made clear, for a capital sentencing scheme to be constitutional, the scheme must "narrow[ ] the class of persons convicted of murder who are eligible for the death penalty." *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), *reh'g denied,* 485 U.S. 944, 108 S.Ct. 1126, 99 L.Ed.2d 286 (1988) (citing *Stephens,* 462 U.S. at 874, 103 S.Ct. 2733). Our Legislature has provided this constitutionally-mandated "narrowing" in Ind.Code § 35–50–2–9. A defendant found guilty of murder under Ind.Code § 35–42–1–1 is not eligible for a death sentence unless the State proves beyond a reasonable doubt one or more of the factors set forth in Ind.Code § 35–50–2–9(b).[5] If a finding that one or more of the factors set forth in Ind.Code § 35–50–2–9(b) is made, the de-

fendant is then eligible for a death sentence; the Supreme Court's "eligibility stage" is finished.

Under the Indiana statute, the "selection stage" requires weighing the aggravating circumstance or circumstances with any mitigating circumstances. A death sentence may be imposed if the mitigating circumstances do not outweigh the aggravating circumstance or circumstances. Ind.Code § 35–50–2–9(k)(2) (1998).

Set forth schematically,[6] the imposition of a death sentence under the Indiana capital murder and sentencing regime requires the following three steps:

*Step (1):* A finding that the State has proved beyond a reasonable doubt the elements of the crime of murder set forth in Ind.Code § 35–42–1–1.

*Step (2):* A finding that the State has proved beyond a reasonable doubt one or more of the death eligibility factors set forth in Ind.Code § 35–50–2–9(b). These first two steps comprise the Supreme Court's "eligibility stage."

*Step (3):* A finding that any mitigating circumstances that exist are outweighed by the aggravating circumstances or circumstances. Ind.Code § 35–50–2–9(k)(2) (1998). This third step comprises the Supreme Court's "selection stage."

There is no dispute but that the finding in step (1) must be made by a jury. And whatever it may say about step (2) (to be discussed at length *infra* ), *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111

---

**5.** The number of eligibility factors sent forth in Ind.Code § 35–50–2–9(b) are many. The ones with which Saylor was charged were: that Saylor had intentionally killed the victim while attempting to commit a robbery, § 35–50–2–9(b)(1)(G), and that at the time the murder was committed, Saylor was on probation after receiving a sentence for burglary, § 35–50–2–9(b)(9)(C).

**6.** Compare my schematic with the "pyramid" with three planes that the Georgia Supreme Court used as an analogy for its state's capital sentencing scheme in responding to the Supreme Court's certified question in *Zant v. Stephens,* 462 U.S. 862, 871, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

L.Ed.2d 511 (1990), holds that a jury is not required to make the finding in step (3).

Where the majority and I differ is whether *Apprendi* requires that the finding of step (2) be made by a jury. I believe *Apprendi* so requires.

### B

Before proceeding, I need to make two additional points about the three steps in our capital murder and sentencing scheme.

First, there are the two entirely distinct functions that the term "aggravating circumstance" plays under our Indiana statute. The term "aggravating circumstance" is used for factors that are weighed in the sentencing determination in step (3). It is also the term that is used for the death eligibility factors in step (2). This distinction is, in my view, important in understanding what *Apprendi* said, and didn't say, about *Walton v. Arizona*.

Second, the fact that *Apprendi* may or may not apply to other states' capital murder and sentencing schemes (including those schemes under which the jury makes a sentencing recommendation to the judge) is not determinative of whether or not it applies to Indiana's. While each state's criminal law is subject to the mandates of the federal constitution, principles of federalism give the states wide latitude in constructing their criminal codes, including their death penalty schemes. Whatever the Supreme Court may or may not have said about the Arizona death penalty scheme when it discussed *Walton v. Arizona* in *Apprendi* (and whatever it may say about the Arizona death penalty scheme when it decides *State v. Ring*, 200 Ariz. 267, 25 P.3d 1139 (2001), *cert granted*, —— U.S. ——, 122 S.Ct. 865, 151 L.Ed.2d 738 (2002)) does not necessarily—and I will argue does not—apply to the Indiana death penalty scheme.

### C

The majority accurately points out that the majority in *Apprendi* discusses *Walton v. Arizona*, a death penalty case in which the Supreme Court upheld Arizona's capital sentencing scheme under which the judge, not jury, finds specific aggravating factors before imposing a death sentence. For reasons alluded to in the Part I–B, *supra*, I disagree with the majority that this discussion constitutes authority for holding that Indiana's capital sentencing scheme is valid under *Apprendi* in all respects. To explain why requires an understanding of the context of the discussion of *Walton* in *Apprendi* as well as a review of the entire discussion.

*Apprendi*, as the majority says, involved a defendant found guilty by a jury of possessing an illegal firearm. Under New Jersey law, an additional sentence was imposed after the trial judge found that the defendant "in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." 530 U.S. at 468–69, 120 S.Ct. 2348. The defendant argued that under the constitution, this additional sentence could only be imposed if the factual determination authorizing the increase in the sentence was made by a jury on the basis of proof beyond a reasonable doubt. *Id.* at 471, 120 S.Ct. 2348.

The Supreme Court agreed with the defendant and held that the Due Process Clause of the Fourteenth Amendment requires states to submit to jury and prove beyond a reasonable doubt any fact (other than the fact of a prior conviction) that increases the penalty for a crime beyond the prescribed statutory maximum. *Id.* at 490, 120 S.Ct. 2348 (citing and quoting *Jones v. United States*, 526 U.S. 227, 252–53, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)).

In dissent, Justice O'Connor argued that such holding was inconsistent with *Walton v. Arizona.* In that case, the defendant had challenged the Arizona capital sentencing scheme, contending that the Constitution required that the jury, and not the judge, make the factual determination of the existence or nonexistence of the statutory aggravating factors. The Supreme Court had rejected his claim.

Arguing that *Walton* refuted the rule announced in *Apprendi,* Justice O'Connor wrote:

Under Arizona law, the fact that a statutory aggravating circumstance exists in the defendant's case " 'increases the maximum penalty for [the] crime' " of first-degree murder to death. If the judge does not find the existence of a statutory aggravating circumstance, the maximum punishment authorized by the jury's guilty verdict is life imprisonment. Thus, using the terminology that the Court itself employs to describe the constitutional fault in the New Jersey sentencing scheme presented here, under Arizona law, the judge's finding that a statutory aggravating circumstance exists 'exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'

*Apprendi,* 530 U.S. at 537, 120 S.Ct. 2348 (O'Connor, J., dissenting) (internal citations omitted). To Justice O'Connor's argument, the majority responded:

Finally, this Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death. For reasons we have explained, the capital cases are not controlling:

"Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed.... The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on all the elements of the charge."

*Apprendi,* 530 U.S. at 496–97, 120 S.Ct. 2348 (internal citations omitted; quoting *Almendarez–Torres v. United States,* 523 U.S. 224, 257, n. 2, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (Scalia, J., dissenting)).

I acknowledge that these two passages have something of the character of ships passing in the night. The *Apprendi* majority says that *Walton* is not controlling because it does not allow "a judge to determine the existence of a factor which makes a crime a capital offense." *Id.* But Justice O'Connor says that that is exactly what *Walton* permits when it allows "a defendant convicted of first-degree murder [to] be sentenced to death *only if* the judge finds the existence of a statutory aggravating factor." *Id.* at 536, 120 S.Ct. 2348 (O'Connor, J., dissenting).

Until the Supreme Court provides further guidance on this point, I think the majority and dissenting positions can be reconciled for purposes today in the following way. First, we should recognize that the Indiana statute is materially different from that of Arizona. The Indiana statute calls for the jury to be involved in step (2);

the Arizona statute at issue in *Walton* apparently did not. More to the point, the Indiana statute imposes upon the State in step (2) the burden of proving beyond a reasonable doubt the existence of one or more death eligibility factors. Furthermore, the jury's finding must be unanimous. Second, we should recall the two distinct functions that the term "aggravating circumstance" plays in the Indiana statute—an "eligibility" function in step (2) and a "selection" function in step (3). In summary, we should not and need not require *Apprendi* to operate with respect to our statute in precisely the same way that it operates with respect to Arizona's, both because our Legislature has chosen to involve the jury much more substantially in ours than in Arizona's and because the term "aggravating circumstance" operates differently in our statute than in Arizona's.

Proceeding in this way, it seems to me that, regardless of how Arizona's capital sentencing scheme operates, the finding required in step (2) of the Indiana scheme is precisely the kind of finding in a capital case that *Apprendi* contemplates being made by a jury: a "determin[ation of] the existence of a factor which makes a crime a capital offense"; a determination of "all the elements of an offense which carries as its maximum penalty the sentence of death"; a determination of the "actions that expose [a defendant] to the death penalty...." *Id.* at 497, 120 S.Ct. 2348 (internal quotation marks and citations omitted).

### D

I think the correctness of this conclusion can be illustrated by the following hypothetical. As noted above, after the State has met its burden of proof under step (1), it must then prove beyond a reasonable doubt the existence of one or more of the death eligibility factors set forth in Ind. Code § 35–50–2–9(b). Some of the existing death eligibility factors depend upon the defendant acting in a particular way while committing the crime, *e.g.*, committing the crime "by unlawful detonation of an explosive," § 35–50–2–9(b)(2); committing the crime by "dismember[ing] the victim," § 35–50–2–9(b)(10); and committing the crime by "burn[ing], mutilatat[ing], or tortur[ing] the victim," § 35–50–2–9(b)(11).

Suppose that the Legislature were to add to Ind.Code § 35–50–2–9(b) a new "hate crime" death eligibility factor: that "the defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." In my hypothetical, suppose further that the State were to seek a death sentence based on this factor. That is, in order for the defendant to be death eligible, the State would be required to prove this "hate crime" aggravator beyond a reasonable doubt. Can there be any question but that *Apprendi* requires such a determination to be made by a jury?

### II

### A

For the reasons set forth above, I believe that *Apprendi* requires that a jury make a determination beyond a reasonable doubt that one or more of the death eligibility factors set forth in Ind.Code § 35–50–2–9(b) have been proven beyond a reasonable doubt by the State in order for a person to be eligible to be sentenced to death in Indiana. However, I believe that in most circumstances the Indiana statute complies with the *Apprendi* mandate. For this reason, I disagree with the conclusion of Judge Hawkins in *State v. Barker*, No. 49G05–9308–CF–095544 (Marion Sup.Ct. Sept. 10, 2001), interlocutory appeal grant-

ed, No. 49S00–0110–DP–461 (Ind. Oct. 10, 2001), that *Apprendi* renders Ind.Code § 35–50–2–9(b) unconstitutional on its face.

Following the completion of step (1), if the defendant has been found guilty, Ind. Code § 35–50–2–9 requires that the jury be reconvened for purposes of (i) considering proof of the existence of one or more of the death eligibility factors set forth in Ind.Code § 35–50–2–9(b), (ii) considering whether any mitigating circumstances are outweighed by the aggravating circumstance or circumstances, and (iii) considering whether the defendant should be sentenced to death, to life without parole, or to a term of years. Unless the jury unanimously [7] concludes that the State has proven the existence of one or more of the death eligibility factors set forth in Ind. Code § 35–50–2–9(b), the proceeding is terminated, and the defendant is not eligible to be sentenced to death. Because of this, I believe that our statute complies with *Apprendi* in all but two limited situations—and that even in some of those two limited situations, *Apprendi* is satisfied.

### B

After evidence has been presented to a jury with respect to the three determinations described in the previous paragraph, the jury retires for deliberations. Our statute then provides that the jury is to return to the court with a "recommendation" as to whether the defendant should be sentenced to death, to life without parole, or to a term of years. The jury's recommendation must be unanimous and so it is possible that, in the event of irreconcilable disagreement, that the jury will have no sentencing recommendation at all.

Our statute provides that, upon receipt of the jury's recommendation, the judge has final authority as to sentencing. If the jury recommends to the judge that the defendant be sentenced to death or to life without parole, I believe that sentencing can proceed in conformity with *Apprendi*. This is because the jury is not permitted to make such a recommendation unless it has first found that the State has proved beyond a reasonable doubt the existence of one of the eligibility factors set forth in Ind.Code § 35–50–2–9(b), i.e., step (2). Therefore, when a jury recommends a sentence of death or life without parole, it has by definition made the predicate determination of death eligibility required by *Apprendi*.

However, in two situations—where a jury recommends a term of years or makes no sentencing recommendation—I believe that *Apprendi* prohibits imposition of death or life without parole. This is because in these two situations the jury need not have found that the State has proved beyond a reasonable doubt the existence of one of the eligibility factors set forth in Ind.Code § 35–50–2–9(b), i.e., step (2).

### C

A jury could, of course, unanimously find that the State has proved beyond a reasonable doubt the existence of one of the eligibility factors set forth in Ind.Code § 35–50–2–9(b), but nevertheless recommend a term of years or make no sentencing recommendation. This might be the result, for example, because the jury found that the mitigating circumstances were not outweighed by the aggravating circum-

7. This unanimity requirement bears emphasizing because it differentiates our statute from those of other "jury recommendation-judicial sentencing" states. Were it not for this unanimity requirement as to one or more death eligibility factors, I do not believe our statute would comply with Apprendi's mandate.

stance or circumstances. Cases such as these would not violate *Apprendi.*

The difficulty that these cases present, of course, is that it is not always apparent, when the jury recommends a term of years or makes no sentencing recommendation, whether it found the defendant to be death eligible or not. Unless it is clear that the jury has found the defendant to be death eligible, I think that *Apprendi* requires that we find that the State has not met its burden of proof as to eligibility.

### D

Having said that, I think there are at least two types of cases where, even though the jury recommends a term of years or makes no sentencing recommendation, it is sufficiently clear that the jury has found the defendant to be death eligible that death may therefore be imposed consistent with *Apprendi.*

### D–1

One such type of case is where the jury has made written findings as to death eligibility, i.e., step (2). We have seen cases in Marion County in which a jury has made a written eligibility finding before recommending a term of years in a case in which the State sought life without parole. *See Holsinger v. State,* 750 N.E.2d 354, 360 (Ind.2001). We have held that such findings are not required. *See Farber v. State,* 729 N.E.2d 139 (Ind.2000); *id.* at 142, n. 2 (Sullivan, J., dissenting) (listing cases). Because such findings would in my view eliminate the *Apprendi* problem, I would direct that they be required in cases proceeding under Ind.Code § 35–50–2–9.

### D–2

A second such type of case is where the jury's verdict in the guilt phase of the trial, i.e., step (1), constitutes a finding of death eligibility. *Pope v. State,* 737 N.E.2d 374, 381 (Ind.2000), *reh'g denied,* illustrates this type of case. In *Pope,* the State sought a sentence of life without parole, asserting two eligibility factors: that the defendant had intentionally killed another human being during a robbery, Ind.Code § 35–30–2–9(b)(1)(G); and that the defendant had committed two murders at the same time, § 35–50–2–9(b)(8). The jury had been instructed that, in order to recommend a sentence of life without parole, it was required unanimously to find the defendant guilty beyond a reasonable doubt of the first eligibility factor "and/or" the second. The defendant argued on appeal that because the eligibility factors were worded conjunctively as well as alternatively, it was impossible to know whether the jury unanimously found any charged aggravating circumstance proven beyond a reasonable doubt.

We held that "the use of 'and/or' appears to have given the jury the option to recommend life without parole where less than all members of the jury found any single charged aggravator to have been proven beyond a reasonable doubt. Such an option is contrary to the mandate of the statute," *Pope,* 737 N.E.2d at 381, and, I would argue, contrary to the mandate of *Apprendi.* However, we held the error to be harmless—and I would hold it to be harmless for *Apprendi* purposes as well— because the jury had demonstrated by its guilt phase verdict that it had found at least one of the eligibility factors to have been proven beyond a reasonable doubt: that the defendant had committed two murders at the same time. In the guilt phase of trial, the jury had unanimously found the defendant guilty beyond a reasonable doubt of the murders of two individuals. As such, it was sufficiently clear that the jury had unanimously found beyond a reasonable doubt the existence of one of the eligibility factors set forth in Ind.Code § 35–50–2–9(b). *Id.*

### E

In conclusion, I would hold that *Apprendi* does not render Indiana's capital murder and sentencing regime, Ind.Code § 35–50–2–9, unconstitutional on its face. However, I would hold that *Apprendi* does not permit a sentence of death (or life without parole) to be imposed in Indiana where a jury has recommended a term of years or has made no sentencing recommendation unless there is a sufficiently clear showing that the jury has found unanimously that the State has proved beyond a reasonable doubt the existence of one of the eligibility factors set forth in Ind.Code § 35–50–2–9(b).

### III

The jury in Saylor's case recommended that he be sentenced to a term of years, not to death. Notwithstanding this recommendation, the trial judge imposed a death sentence. *Saylor v. State*, 686 N.E.2d 80, 87 (Ind.1997). As discussed above, it is my position that *Apprendi* does not permit imposition of a death sentence under the Indiana statute unless the jury unanimously finds that the State has met its burden of proving the existence of one or more of the eligibility factors set forth in Ind.Code § 35–50–2–9(b). Because the jury recommended against death here without making written eligibility findings, and because the case here does not fall within the categories of cases described in either part II–D–1 or part II–D–2 *supra,* I find the sentence impermissible under *Apprendi.*

The eligibility factors which the State alleged in support of a death sentence were that Saylor had intentionally killed the victim while attempting to commit a robbery, Ind.Code § 35–50–2–9(b)(1)(G), and that at the time the murder was committed, Saylor was on probation after receiving a sentence for burglary, § 35–50–2–9(b)(9)(C). No jury findings of the kind described in part II–D–1 are of record as to the existence of the aggravating circumstances.

As to the category of cases described in part II–D–2, I am unable to conclude from the guilt phase (step (1)) of the trial that the jury unanimously convicted Saylor of both intentional murder and robbery. The jury did unanimously find him guilty of robbery. But the murder charge on which the jury unanimously found him guilty alleged that he "knowingly" killed the victim, not that he "intentionally" did so.[8] As the aggravating circumstance requires a finding by the jury of "intentional" killing, the jury's guilt phase verdict in this case did not constitute a finding of the existence of one of the death eligibility factors.

As to the other charged aggravating circumstance, killing while on probation, I am unable to join Justice Boehm's analysis. While he may be correct that *Apprendi* is satisfied with respect to this aggravator, I do not think that making a defendant eligible for death on the sole basis of a knowing killing while on probation "genuinely narrow[s] the class of persons eligible for

---

8. Count I of the information alleged that Saylor "knowingly kill[ed]" the victim. (R. at 37.) During closing argument, the prosecutor defined murder as occurring when "a person knowingly or intentionally kills another human being." (R. at 4941.) The trial court instructed the jury that murder occurs when "a person knowingly or intentionally kills another human being." (R. at 5064, 5069.) While it is possible that under these circumstances the jury did find Saylor guilty of intentional murder, it is also possible that it found him guilty of only knowing murder. (To this extent, our opinion on direct appeal was incorrect in saying that the jury had found Saylor guilty of intentional murder. *Saylor,* 686 N.E.2d at 89.) The fact that the jury also convicted Saylor of felony murder also does not constitute a finding of guilt of intentional murder since there is no mens rea requirement for felony murder.

the death penalty and .... reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder," *Stephens,* 462 U.S. at 877, 103 S.Ct. 2733, as required by the U.S. Constitution.

I would find that the mandate of *Apprendi* that a jury unanimously find beyond a reasonable doubt that the State has proved one of the eligibility factors set forth in Ind.Code § 35–50–2–9(b) has not been met in this case. Accordingly, I would set aside Saylor's sentence of death.